1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   BRADFORD TECHNOLOGIES, INC,              No. C 11-04621 EDL

9              Plaintiff,                    **FURTHER ORDER GRANTING IN
                                             PART DEFENDANTS' MOTION FOR
10      v.                                   ORDER TO SHOW CAUSE AND FOR
                                             SANCTIONS**
11  NCV SOFTWARE.COM, et al.,

12             Defendants.
                                        /
13

14  **I.    Introduction**

15         Defendants Karma Technologies LLC and John David Biggers ("Defendants") moved for

16  monetary and terminating sanctions pursuant to Rule 37 and the Court's inherent authority based on

17  Plaintiff Bradford Technologies, Inc. ("BTI") and its attorney's admitted breach of a Stipulated

18  Protective Order, whereby attorney Roger Wintle turned over Defendants' "attorneys eyes only"

19  source code to his client, Jeffrey Bradford of BTI, who then personally reviewed and evaluated the

20  highly confidential source code in advance of a mediation.  These admitted breaches of the

21  Stipulated Protective Order are willful, sanctionable violations of a Court Order.  Defendants also

22  claim that Mr. Bradford gained commercial advantage by using the source code to upgrade one of

23  his commercial software products after reviewing Defendants' source code, but Plaintiff disputes

24  that the source code was used for this purpose.

25         This Court heard oral argument on the motion on November 20, 2012, stayed the case except

26  as to expedited discovery on the issue of BTI's alleged improper use of Defendants' source code

27  following the violation of the protective order, and thereafter entered the parties' stipulated order

28  granting in part and denying in part the motion (Dkt. # 131).  Given the seriousness of the issues

before the Court and the gravity of the sanctions under consideration, the Court issues the following

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Order to further explain its reasoning and the current status of this case.

## II.     Background

Plaintiff Bradford Technologies, Inc. ("BTI")'s Second Amended Complaint makes claims for: (1) breach of contract against Defendant John David Biggers, and (2) misappropriation of trade secrets, (3) copyright infringement, (4) unjust enrichment, (5) intentional interference with prospective advantage, (6) unfair competition, (7) trade libel, and (8) injunctive relief against Defendants NCV Software, Metro National Financial, Karma Technologies, Rodney Newman, and John David Biggers.  The SAC alleges that Mr. Biggers worked as a computer programmer for Plaintiff, the developer of ClickForms and CompCruncher appraisal software, from approximately 2007 to 2009.  According to the SAC, Mr. Biggers was terminated when it was discovered that he was developing a software program identical to Plaintiff's, using Plaintiff's source code, and selling the program at a discount to Plaintiff's clients using Plaintiff's client lists.  Mr. Biggers signed a Stay of Litigation Agreement and admitted liability.  However, six months later, BTI claims to have discovered another software product on the market, Canvas, that was very similar to a version of CompCruncher that Mr. Biggers participated in developing during his employment with BTI.  BTI therefore filed this lawsuit.

The parties agreed to participate in early mediation following an exchange of source code and review of the source code by independent experts to determine if Canvas was based on CompCruncher.  Declaration of Heather Sneddon ("Sneddon Decl.") Ex. B.  To facilitate the exchange of information and retention of experts prior to mediation, counsel for the parties signed a Stipulated Protective Order ("SPO") which was entered by the Court.  Dkt. # 48, 55.  Mr. Bradford, President of BTI, personally signed an "Agreement to be Bound by the Stipulated Protective Order." Dkt. # 72-2.  The SPO provided for designation of certain materials as Highly Confidential:

> The following documents, things, and information may properly be marked as *HIGHLY CONFIDENTIAL* under this Protective Order: (a) Confidential Information the disclosure of which to an adverse Party or the directors, officers, and employees of the adverse Party is reasonably believed to cause the disclosing Party competitive injury through its advertent or inadvertent use, and for which treatment of the information as *CONFIDENTIAL* is insufficient to protect against that competitive injury, and (b) a Party's trade secrets, intellectual property or other information, including computer source code, that the producing Party believes in good faith to be so commercially sensitive or confidential that disclosure to persons other than those authorized poses a risk of impairing the

United States District Court
For the Northern District of California

interests of the producing Party, and for which treatment of the information as *CONFIDENTIAL* is insufficient to protect against that injury.

Dkt. # 55 ¶ 3.  The SPO further specified that:

Documents and information designated *HIGHLY CONFIDENTIAL* may not be disclosed to receiving Parties or their officers, directors, shareholders, members, managers or employees, unless the Party producing the information designated *HIGHLY CONFIDENTIAL*, or the Party designating a non-party's document production, deposition, or other discovery response as *HIGHLY CONFIDENTIAL*, agrees in writing to allow such access or the Court orders such access.

Id. ¶ 5(f).  Additionally, the SPO provided that:

Experts and consultants retained or employed by a Party's attorney solely for the purpose of assisting in the preparation of this litigation for trial. Such experts and consultants may not be currently employed by any Party, or any affiliates, parents, subsidiaries, officers, directors, managers, members, agents, representatives or employees of any Party. Such experts and consultants likewise may not have been formerly employed by any Party or any affiliates, parents, subsidiaries, officers, directors, managers, members, agents, representatives or employees of any Party, nor have formerly served as an independent contractor for any Party or any affiliates, parents, subsidiaries, officers, directors, managers, members, agents, representatives or employees of any Party, within a five (5) year period prior to their engagement in this litigation.

Id. ¶ 5(c).  The parties exchanged disks containing their respective source code pursuant to the SPO.

After receiving Plaintiff's source code, Defendants hired an independent expert familiar with Delphi, the software platform on which Canvas and CompCruncher are built, to prepare a preliminary report to be exchanged with Plaintiff prior to the mediation.  Amended Sneddon Decl. ¶ 8.  Defendants claim that their expert concluded that there were very few similarities between the code, and of those similar elements none were copywritable and/or they were publicly available.  See Amended Sneddon Decl. ¶ 9; Biggers Reply Decl. ¶¶ 5, 15-18,

Defendants produced their source code to Plaintiff's counsel on three disks designated Highly Confidential under a cover letter specifically reminding Plaintiff's counsel that this designation meant that the disks could not be viewed by anyone at BTI and providing counsel with a password to access the files.  Sneddon Decl. Exs. P, Q (The cover letter stated, "As a reminder, the contents of the enclosed disks labeled CANVAS Source Code, Delphi 4, Delphi 7 and

**United States District Court**
For the Northern District of California

Marketing have been designated HIGHLY CONFIDENTIAL pursuant to the parties' Stipulated Protective Order and may not be viewed or accessed by anyone at Bradford Technologies, Inc. The files on the first three disks, which contain source code, are password protected with the password: [XXXX].").

Mr. Bradford considered potential experts to evaluate Defendants' source code, and thought of a company located next to his office, Blackbag Technologies, Inc., that he believed performs "CSI-type work" on computers. Bradford Decl. ¶ 15. Mr. Bradford offered to contact Blackbag and deliver the disks, so attorney Mr. Wintle mailed the disks he had received from Defendants directly to Mr. Bradford by Federal Express so that Mr. Bradford could deliver them "subject to a written agreement being obtained between Mr. Wintle and Blackbag." Bradford Decl. ¶ 17; Wintle Decl. ¶ 5. There is no evidence that Mr. Wintle ever evaluated whether Blackbag would be an appropriate expert to evaluate the source code, contacted Blackbag, or attempted to obtain any written agreement with Blackbag. Providing the disks directly to his client who was forbidden to access them under the SPO was improper, and this impropriety was exacerbated by also providing the password to his client. Though initially unclear from the documentary evidence presented to the Court, during oral argument on this motion Mr. Wintle confirmed that he included the cover letter from Defendants containing the password to the disks along with the disks in the envelope sent to Mr. Bradford. Further, it is evident that Mr. Bradford reviewed the cover letter because it was the only document containing the password that Mr. Bradford needed in order to access the source code disks and the files contained therein.

Mr. Wintle, an attorney for over 30 years, states that he "simply did not think about the fact that this was a violation" of the SPO. Wintle Decl. ¶ 6, 12. Such an omission is astonishing in light of his professional obligation to strictly adhere to the Court- ordered "attorneys eyes only" protection for Highly Confidential information. Mr. Bradford claims that he received the disks but did not open the envelope, spoke to Blackbag and determined that the company does not do software evaluations so was not a suitable expert. Bradford Decl. ¶ 18. Mr. Bradford then retained the sealed envelope containing the source code disks for several months while he "tried to think of someone who could assist" in evaluating software built on the Delphi platform. Bradford Decl. ¶¶

**United States District Court**
For the Northern District of California

19-20.  There is no evidence that Plaintiff or Mr. Wintle ever made any further effort to engage an independent expert to evaluate the source code prior to the mediation or any time prior to the hearing on this motion.

The mediation was postponed several times, but finally set for October 12, 2012.  A month in advance, Defendants contacted Plaintiff to try to set a date for exchange of expert reports.  Two weeks later, Plaintiff's counsel responded that he was not meeting with his client to "go over the findings" until two days before the mediation so there could be no pre-mediation exchange of expert reports.  Sneddon Decl. Ex. U.  This statement appears to have been misleading, because Plaintiff never engaged an outside expert to prepare any comparisons or findings.  Instead, Mr. Bradford asked Mr. Linne, an employee of BTI who was instrumental in creating CompCruncher,[1] to prepare a presentation comparing the functionality of CompCruncher to Canvas.  Bradford Decl. ¶ 21.  Plaintiff claims that Mr. Linne did not have access to or examine Defendants' source code disks in creating this presentation.  Bradford Decl. ¶¶ 21, 29; Linne Decl. ¶ 3.

Additionally, Mr. Bradford suspected that it would be almost impossible for an outside software expert to conclude that the two software products were the same, but that he personally would be able to determine if there were traces of BTI source code in Canvas.  Bradford Decl. ¶ 21.  Therefore, despite the fact that he personally signed an acknowledgment of the SPO and received and reviewed the cover letter warning that no one at BTI could review the files, Mr. Bradford spent two hours searching Defendants' source code disk for similarities two days before the mediation.  Bradford Decl. ¶¶ 22-23, 38.[2]  Upon examination, he determined that the source code provided by Defendants was from 2011, instead of 2009 when Canvas was first developed.  Bradford Decl. ¶ 24.

---

[1]Defendants claim that Mr. Linne is an officer of AppraisalWorld, an entity related to Plaintiff.  Biggers Decl. ¶ 12; Sneddon Decl. Ex. W.  Plaintiff disputes this, but admits that Mr. Linne is an employee of Plaintiff BTI.  Bradford Decl. ¶ 21; Linne Decl. ¶ 4.  Either way, he was expressly prohibited from viewing Highly Confidential information under the SPO.

[2]Defendants argue that Mr. Bradford's review likely occurred earlier than two days before the mediation because Mr. Wintle told defense counsel almost two weeks before the mediation that he was not meeting with his client to "go over the findings" until two days before the mediation.  Sneddon Decl. Ex. U.  While the date of the improper review does not necessarily impact the  appropriate sanction for violation of the SPO, it may go to Plaintiff's credibility and the length of time that BTI had to copy and use the source code.  Whether and the extent to which this occurred will be explored during the expedited discovery agreed to at the hearing.

1    Mr. Bradford contends that this was an attempt to trick an expert into not finding similarities

2    because Defendants had two years to tweak the software to eliminate similarities. Mr. Bradford

3    nonetheless states that he found similarities between some files and routines. Bradford Decl. ¶¶ 25-

4    26.[3] Mr. Bradford claims that he did not save or copy any information from the CDs, and returned

5    them to attorney Mr. Wintle the next day. Bradford Decl. ¶ 37.

6        Defendants believe that, after they produced source code to Mr. Wintle who then gave it to

7    Mr. Bradford in violation of the SPO, it was incorporated into a new version of CompCruncher and

8    related software program that has recently been released by Plaintiff's affiliate company,

9    AppraisalWorld. Sneddon Decl. Exs. W-X; Biggers Decl. ¶¶ 16-18. Mr. Bradford claims that he

10   did not gain any competitive advantage by looking at the source code files, because he could not

11   have sufficiently comprehended the source code within two hours to later use it in a meaningful way.

12   Bradford Decl. ¶ 33. He contends that CompCruncher and ClickForms were developed over 12

13   years and are periodically updated. Linne Decl. ¶ 6. Development on recent updates was started in

14   2011, and Plaintiff claims not to have used any of the source code contained on Defendants' disks,

15   which were produced long after work on the updates began. Bradford Decl. ¶ 34. Plaintiff further

16   claims that it would not have used Defendants' "outdated" source code in its products as Mr. Linne

17   considered Mr. Biggers a substandard programmer when employed by Plaintiff. Linne Decl. ¶ 10;

18   Bradford Decl. ¶ 36. In contrast, Defendants claim Mr. Bradford has the capacity to understand and

19   write Delphi code and could easily have ascertained the proprietary programming methodologies in

20   Defendants' source code during a two hour review and have downloaded it for future improper use.

21   Biggers Reply Decl. ¶¶ 20-22.

22       In connection with this motion, both sides have disclosed information relating to

23   communications made after initial attendance at a private mediation session. Neither side raised the

24   issue of mediation confidentiality or objected to the disclosures made by the other side, and under

25   the circumstances here, disclosure was permissible. First, after learning of the SPO violations,

26

27       [3]Mr. Bradford claims that "[d]uring the entire time that the CDs were in my possession, they
     remained in the sealed Federal Express envelope in which I had received them. The envelope remained

28   unopened in my office for the entire period." Bradford Decl. ¶ 28. This directly contradicts his
     admission that he reviewed the disks himself, and thus the envelope must have been opened to obtain
     the disks.

United States District Court
For the Northern District of California

Defendants specified to the mediator that the mediation was terminated and the remainder of the discussions constituted a "conference" that was not part of a confidential mediation session. Further, the parties expressly waived any claim of mediation confidentiality both in open court during the hearing on this motion and during the mediation itself. Both parties and the mediator agreed that the violation of the SPO and its implications should be reported to this Court and were not subject to mediation confidentiality. See Olam v. Congress Mortg. Co., 68 F.Supp.2d 1110, 1128-1129 (N.D.Cal.1999) (considering evidence about what occurred during a mediation where parties expressly waived mediation confidentiality protections).[4]

While present for the mediation, Plaintiff's attorney Mr. Wintle realized that his client had looked at the CDs and notified the other side of this issue for the first time. Wintle Decl. ¶¶ 7-9. Mr. Wintle further revealed that Plaintiff had not hired an independent expert prior to the mediation despite the parties' agreement. Sneddon Decl. ¶¶ 32-34. According to Defendants, Mr. Wintle informed them that Mr. Linne had analyzed the software programs. Sneddon Decl. ¶ 36; Biggers Decl. ¶ 14. However, Plaintiff now claims that Mr. Linne did not view the confidential disks and only evaluated public versions of the software. It does not appear that Plaintiff revealed during the mediation that Mr. Bradford had personally looked at the CDs, and this even more serious admission was apparently made for the first time in opposition to this sanctions motion. After these revelations regarding violations of the SPO, the mediation was terminated. Wintle Decl. ¶ 10; Sneddon Reply Decl. ¶¶ 6-8.   The parties then discussed the need to report the violation to the Court.

Following the aborted mediation, Defendants' counsel sent a letter making multiple demands based on the admitted violation of the SPO. Sneddon Decl. Ex. Y. Approximately one month after the mediation, this sanctions motion was filed.

## III.   Legal Standard

Defendants move the Court for an order to show cause why Plaintiff BTI and Mr. Bradford should not be held in contempt of court and for further relief and sanctions under Rule 37(b) and the

---

[4]The Court notes that the parties had chosen to attend a private mediation, so the Northern District of California's ADR Local Rule 6 governing court-sponsored mediation does not apply. See Facebook, Inc. v. Pacific Northwest Software, Inc., 640 F.3d 1034, 1041 (9th Cir. 2011) (private mediation not subject to ADR Local Rule 6).

Court's inherent authority.[5]  Rule 37(b)(2) provides that:

> If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
>
> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

To obtain a civil contempt citation, the moving party must show by clear and convincing evidence that the opposing party violated a specific and definite order of the Court.  See In re Dual Deck Video Cassette  Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) ("We must determine, under a restrained standard of review, whether the district court could properly determine (1) that Go-Video violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence.").   If the moving party makes this showing, the burden shifts to the party allegedly in contempt to show that it cannot comply.  See U.S. v. Montgomery Global Advisors, 2005 U.S. Dist. LEXIS 18468, *6 (N.D. Cal. Aug. 1, 2005); U.S. v. Hempfling, 2008 U.S. Dist. LEXIS 64774, *9 (E.D. Cal. June 6, 2008). Contempt is inappropriate where a party has taken "all the reasonable steps" it can take to comply. Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1479 (9th Cir. 1999) (citing Balla v. Idaho State Bd. of Corrections, 869 F.2d 461, 466 (9th Cir. 1989)).

---

[5]In their moving papers, Defendants initially also sought to hold attorney Mr. Wintle in contempt. However, during oral argument, Defendants clarified that they are not seeking sanctions against him.  The Court has previously ordered the payment of costs and fees reasonably incurred by Defendants based on Plaintiff's violation of the PTO as to Plaintiff only.  Dkt. # 131.

**United States District Court**
For the Northern District of California

1    IV.    **Analysis**

2           **A.    Contempt of Court**

3           Defendants argue that BTI and Mr. Bradford knowingly violated the SPO in bad faith.  It is

4    undisputed that Mr. Wintle signed the SPO detailing how Highly Confidential information was to be

5    treated and Mr. Bradford signed a separate "acknowledgment" of the SPO, the designation on the

6    disks themselves was unmistakable, and the cover letter sent with the disks again pointed out that the

7    disks were not to be shared with anyone at BTI.  Mr. Bradford claims that he did not understand the

8    extent of the SPO, but he does not dispute that he was aware of it or that the disks were labeled

9    Highly Confidential.  Further, Mr. Bradford necessarily received and reviewed the cover letter

10   containing the warning about the Highly Confidential designation, because the same letter contained

11   the password that he needed to access the files on the source code disks.  This constitutes clear and

12   convincing evidence that Plaintiff BTI and Mr. Bradford knowingly violated a specific order of the

13   Court.  Cf. Hi-Tek Bags, Ltd. v. Bobtron Int'l, Inc., 144 F.R.D. 379, 384 (C.D.Cal. 1992) (attaching

14   confidential documents to motion to dismiss in violation of protective order was "grossly negligent"

15   and warranted terminating sanctions even if violation was unintentional).

16          Plaintiff counters that it "substantially complied" with the SPO and acted in good faith

17   because, other than Mr. Bradford viewing Defendants' source code on the eve of mediation, it has

18   complied with the SPO.  However, "substantial compliance" does not encompass serious, direct

19   violations such as those at issue here.  See In Re Dual-Deck, 10 F.3d at 695.  The violation negated

20   the central purpose of the SPO – to protect against disclosure of highly confidential source code to a

21   direct competitor while allowing expert discovery necessary to resolving the trade secret and

22   copyright claims regarding that source code, and it occurred without any valid mitigating

23   circumstances.  Strict observation of protective orders is essential to the sound and just operations of

24   the civil justice system in cases like this one that require discovery of highly sensitive trade secrets

25   or other confidential information.  Parties agree to and courts order "attorneys eyes only" protective

26   orders *specifically* in order to allow for the disclosure of otherwise confidential information so that

27   cases can be resolved on their merits, and there is both an expectation and a legal obligation to

28   comply with them.  Indeed, at oral argument Defendants' counsel explained that his clients in this

United States District Court
For the Northern District of California

case were concerned about entering into an SPO and disclosing their source code for fear that their secrets would be revealed to their direct competitor, and he reasonably assured them that the SPO would protect the source code from disclosure.  He had a right to expect that all parties would comply with the SPO, as did the Court.  Protective orders are entered in cases involving, among other things, issues of national security, the most valuable patents in the world, and highly valuable commercial secrets – and they are almost universally complied with despite the sometimes enormous financial or other incentives to violate them.  Regardless of whether it is an issue of national importance, international interest or the source code for appraisal software, SPOs are an integral part of the litigation process and must be complied with so that justice ultimately prevails.  There is no "substantial compliance" when an SPO is directly violated.

Mr. Wintle also notes that he volunteered information about the violations of the SPO to show he was acting in good faith, and certainly he made the right decision to do so.  Such candor is his *duty* as an officer of the Court.  Additionally, it does not appear that Mr. Bradford was fully forthcoming about the extent of the violations of the SPO at the outset, since Mr. Bradford's personal review of the source code was only acknowledged in the opposition to this motion.  In short, there is no "good faith and reasonable interpretation" of the SPO that might excuse Plaintiff's actions.

Plaintiff opposes the imposition of civil contempt sanctions as such sanctions may only be remedial.  Generally, civil contempt sanctions "are employed for two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."  Whittaker Corp. v. Execuair Corp., 953 F.2d 510, 517 (9th Cir. 1992).  Here, contempt sanctions are arguably coercive to the extent that there is nothing Plaintiff or its counsel can do to "un-ring the bell" and make things right after disclosing Defendants' source code.  See Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 781 (9th Cir. 1983) ("The power to impose coercive sanctions to compel obedience to an order in a civil contempt is limited by the individual's ability to comply with the court's order. . . . No matter how reprehensible the conduct is it does not 'warrant issuance of an order which creates a duty impossible of performance, so that punishment can follow.'") (internal citations omitted); In re Remington Arms Co., Inc., 952 F.2d 1029, 1033

United States District Court
For the Northern District of California

1   (8th. Cir. 1991) ("after-the-fact remedy [of contempt order] is largely ineffectual in a trade secrets

2   case, however, for once the information is wrongfully released, the trade secret is lost forever and no

3   sanction imposed on the violator can retrieve it")..  However, under the unique facts of this case,

4   dismissal may even be "remedial," since there is no way to undo Plaintiff's review of Defendants'

5   source code and the knowledge will likely give Plaintiff an unfair advantage in the litigation.

6           Further, monetary sanctions for fees and costs incurred in preparing for and attending the

7   mediation and preparing the sanctions motion are remedial.   Plaintiff agreed to monetary sanctions

8   during oral argument, and the parties submitted further briefing on the amount of costs and fees.

9   The Court has previously awarded $96,939.27 in remedial costs and fees in a separate Order.  See

10  Dkt. # 131.  These costs and fees are justified under both the Court's contempt power as well as

11  Federal Rule of Civil Procedure 37(b)(2)(c).  Additionally, if Defendants can show that Plaintiff

12  used the confidential information it gained through its violation of the SPO for commercial gain (i.e.,

13  by incorporating Defendants' source code into updates to its own or an affiliated company's

14  software) then compensation for that damage and other sanctions may also be appropriate.

15          Based on the parties' agreement, the Court has stayed the case except as to expedited

16  discovery on the extent and impact of Plaintiff's use of Defendants' source code, as detailed in the

17  Court's December 7, 2012 Stipulated Order.  Id.  Once that discovery is completed and the parties

18  have reported back the Court, the Court may issue a further Order specifying what, if any, additional

19  contempt sanctions are warranted.

20          **B.       Other Sanctions**

21          In their moving papers, Defendants argue that in addition to contempt, the Court should issue

22  terminating sanctions against Plaintiff under Rule 37(b)(2)(iii) and (v).  They acknowledge that these

23  severe sanctions are only warranted for the most extreme willful or bad faith violations, but contend

24  that the misconduct here  rises to that level.  See Falstaff Brewing Corp. v. Miller Brewing Co., 702

25  F.2d 770, 782 (9th Cir. 1983).  They point out that the bad acts here involved both lawyer and client,

26  relate to proprietary source code and dispositive issues of trade secret misappropriation and

27  infringement, and cannot be undone by any lesser sanctions because Plaintiff now has an inherent

28  unfair advantage in this litigation.

**United States District Court**
For the Northern District of California

1    Plaintiffs counter that terminating sanctions are not warranted because there has been no

2  "egregious" violation of a court order.  The Court disagrees with Plaintiff's characterization of its

3  violation as less than egregious, but "egregious" is not the standard.  The Ninth Circuit employs a

4  multi-factor test when considering case-dispositive sanctions under Rule 37(b)(2): "(1) the public's

5  interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk

6  of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on

7  their merits; and (5) the availability of less drastic sanctions. . . . The sub-parts of the fifth factor are

8  whether the court has considered lesser sanctions, whether it tried them, and whether it warned the

9  recalcitrant party about the possibility of case-dispositive sanctions."  <u>Connecticut General Life Ins.</u>

10  <u>Co. v. New Images of Beverly Hills</u>, 482 F.3d 1091, 1096-1097 (9th Cir. 2007).  The Ninth Circuit

11  has cautioned that this test is not mechanical, but instead "provides the district court with a way to

12  think about what to do, not a set of conditions precedent for sanctions or a script that the district

13  court must follow."  <u>Id.</u>  However, it has explained that "[w]hat is most critical for case-dispositive

14  sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery

15  violations 'threaten to interfere with the rightful decision of the case."  <u>See Valley Eng'rs v. Electric</u>

16  <u>Eng'g Co.</u>, 158 F.3d 1051, 1057 (9th Cir.1998) (quoting <u>Adriana Intl. Corp. v. Lewis & Co.</u>, 913

17  F.2d 1406, 1412 (9th Cir.1990)).

18    As stated above, the Court has stayed the case except as to expedited discovery on the extent

19  and impact of Plaintiff's use of Defendants' source code in violation of the SPO.  This discovery

20  will likely be relevant to an analysis of these factors.  Therefore, the Court will defer ruling on

21  whether terminating sanctions, or some lesser or additional sanctions, are appropriate.

22

23    **IT IS SO ORDERED.**

24
Dated: January 3, 2013

25    _____
ELIZABETH D. LAPORTE
26    United States Magistrate Judge

27

28

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California